UNITED STATES, Appellant,

v.

Tony W. ALSTON, Appellee.

No. 13506.

District of Columbia Court of Appeals.

Argued En Banc April 3, 1979.

Decided Feb. 7, 1980.

John W. Polk, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Washington, D. C., at the time the brief was filed, John A. Terry, and Roberta T. Eaton, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellant.

Gaillard T. Hunt, Washington, D. C., appointed by the court, for appellee.

Silas J. Wasserstrom, Public Defender Service, Washington, D. C., appointed by the court as amicus curiae, for appellee.*

Before NEWMAN, Chief Judge, and KELLY, KERN, GALLAGHER, NEBEKER, HARRIS, MACK and FERREN, Associate Judges, and YEAGLEY, Associate Judge Retired.**

FERREN, Associate Judge:

On January 20, 1978, after more than 33 months on appeal, this court reversed the 1975 conviction of Tony W. Alston for the misdemeanor of carrying a pistol without a license, D.C.Code 1973, § 22–3204, and remanded the case for a new trial. *Alston v. United States*, D.C.App., 383 A.2d 307 (1978).[1] After remand, the trial court dismissed the indictment on the ground that the inordinately long appeal period had deprived Alston of his Sixth Amendment right to a speedy trial. The government has appealed. We conclude that (1) to the

---

\* We express our appreciation to Mr. Wasserstrom and the Public Defender Service for participating as amicus curiae by appointment of the court.

\*\* Judge Yeagley's status changed from that of Associate Judge to Associate Judge, Retired, on April 20, 1979. *See* D.C.Code 1973, § 11–1502.

1. Alston's co-defendant, Robert Burton, who entered a guilty plea to the same charge, had testified at the plea proceeding that Alston had never possessed the gun. Burton declined, however, on Fifth Amendment grounds, to testify on Alston's behalf at trial, and the trial court denied Alston's request that the record of Burton's exculpatory testimony be admitted into evidence. A division of this court held that this testimony was admissible "under the prior recorded testimony exception to the hearsay rule," *Alston, supra* at 315, and that Alston had been denied his constitutional right to a fair trial because he had been prevented from presenting "relevant, facially exonerating, and admissible prior recorded testimony to the jury—testimony which constituted his only defense." *Id.*

extent a constitutional deprivation can be premised on appellate delay, the proper evaluative framework is due process, not speedy trial; (2) the predominant concern of this inquiry is prejudice to the defendant; and (3) despite a 33-month appeal period, the prejudice fairly attributable to the government, on the facts here, was insufficient to warrant dismissal of the indictment. Accordingly, the trial court's ruling must be reversed and the case remanded for trial.

### I. *Proceedings to Date*

Appellee Alston was arrested on October 14, 1974. Four months later, a jury convicted him of carrying a pistol without a license. On April 28, 1975, he was sentenced for up to ten years under the federal Youth Corrections Act, 18 U.S.C. §§ 5005 *et seq.* (1976). From the time of his arrest, Alston served 30 months in jail and at the Youth Center. He was released on parole in April 1977.[2]

Soon after sentencing, Alston filed a notice of appeal (May 8, 1975). Seven weeks later, the Superior Court record was certified to this court (June 24, 1975), and almost nine months later, a division of this court heard oral argument (March 18, 1976).[3] After another 22 months, Alston's conviction was reversed (January 20, 1978). The mandate was issued to the trial court almost a month later (February 13, 1978), whereupon the judgment of conviction was vacated (March 2, 1978). Overall, the period covering arrest, trial, sentencing, and notice of appeal totaled almost seven months. The period of appeal through issuance of the mandate covered an additional 33¼ months.

After remand, the case was reassigned on April 4, 1978, to Judge Hess. On April 24,

Alston filed a motion to dismiss the indictment on speedy trial grounds. Judge Hess granted the motion on July 1, 1978. After reciting the foregoing chronology (Findings 1–9) and applying the balancing approach of *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), he announced the following findings:

- Over three years and seven months have . . . elapsed since defendant was arrested [Finding 10].

- None of this delay can be attributed to the defendant. . . . [Finding 11].

- The overwhelming bulk of the delay . . . occurred while the case was in the Court of Appeals. . . . [Finding 11].

- Defendant has timely asserted his right to a speedy trial [Finding 12].[4]

- Defendant has been prejudiced in several respects, in addition to the usual fading of memory, by the lapse of over three years and seven months between his arrest and his second trial. He was incarcerated for approximately thirty months. The government asserts that he has not suffered prejudice thereby, because his probation in an earlier case was revoked, and he was given a sentence to run concurrently with the one in this case. The revocation of his probation, however, occurred only after his subsequently reversed conviction in the instant case [Finding 13].

- The Court also finds that the defendant has suffered an undue amount of anxiety and concern because of the delay. He has had a criminal charge pending against him for the past forty-three months. He was convicted once and served his sentence, only to have the conviction reversed nine months after he was released on parole [Finding 13].

- Defendant has been further prejudiced in that he may no longer be eligible for sentencing under the Youth Corrections Act if he is convicted following a second trial. He turned 22 on January 25, 1976 [Finding 13].

---

**2.** The docket entries are confusing, but it appears that during the four months between arrest and trial, Alston may have been free on bond for two or three weeks; otherwise, he was incarcerated between October 14, 1974 (arrest) and a date in April 1977 (parole) which is not in the record before us.

**3.** During this period, the government sought and received extensions of time for filing its brief totaling 55 days. Alston unsuccessfully opposed one of these extensions.

**4.** More specifically, "[o]n November 10, 1975, he filed an opposition in the Court of Appeals to the government's motion for extension of time to respond. On December 1, 1975, he moved that the government's brief in the Court of Appeals be dismissed, because, *inter alia*, it was filed untimely. On January 30, 1976, defendant moved for advancement of the case on the appellate calendar" [Finding 12].

The government has appealed the order dismissing Alston's indictment.[5] *See* D.C.Code 1973, § 23–104(c).

## II. *Speiedy Trial or Due Process?*

██ Alston's Sixth Amendment right to a speedy trial embraces the period between arrest and trial, here 4½ months (October 14, 1974–February 24, 1975).[6] *See United States v. Marion*, 404 U.S. 307, 321, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971) (speedy trial right attaches at arrest). It also applies to the post-appeal period, *i. e.*, the time between issuance of the appellate court's mandate reversing a conviction and commencement of a new trial (or decision on a post-appeal speedy trial motion), here 3½ months (February 13–June 1, 1978).[7]

██ Under the circumstances of this case, we conclude that these two periods, standing alone or together, have not deprived Alston of his constitutional right to a speedy trial.[8] The question, therefore, is how to treat Alston's speedy trial claim based on appellate delay, *i. e.*, on the period between the filing of the notice of appeal on May 8, 1975 (approximately one week

---

5. On October 31, 1978, a division of this court heard argument on Alston's motion for summary affirmance and the government's corresponding motion for summary reversal. Both motions were denied on January 19, 1979, and on the same date we set the case for argument before the en banc court.

6. The Sixth Amendment, accordingly, covers the period of pretrial and mid-trial government appeals under D.C.Code 1973, § 23–104. *See Day v. United States*, D.C.App., 390 A.2d 957, 965–66 (1978).

 In *Pollard v. United States*, 352 U.S. 354, 361, 77 S.Ct. 481, 486, 1 L.Ed.2d 393 (1957), the Supreme Court assumed "*arguendo* that sentence is part of the trial." In *United States v. Campbell*, 531 F.2d 1333, 1335 (5th Cir. 1976), *cert. denied*, 434 U.S. 851, 98 S.Ct. 164 (1977), concerning a defendant who was not finally sentenced until six years after conviction, the court considered arguments advanced against the delay under both Sixth Amendment and due process "together." In *Doescher v. Estelle*, 454 F.Supp. 943, 949 (N.D.Tex.1978) (dicta), the court citing *Pollard* and *Campbell* said that "unreasonable delay in sentencing may constitute a violation of the Sixth Amendment." We intimate no views on the applicability of the Sixth Amendment speedy trial right to the period between conviction and sentencing.

7. At the time the Sixth Amendment was adopted, there was no right of appeal, as such, after a criminal conviction; relief was available only by way of a habeas corpus petition. *See Griffin v. Illinois*, 351 U.S. 12, 21, 76 S.Ct. 585, 591, 100 L.Ed. 891 (1956) (Frankfurter, J., concurring); *McKane v. Durston*, 153 U.S. 684, 687, 14 S.Ct. 913, 914, 38 L.Ed. 867 (1894). In fact, for nearly a century after the Bill of Rights was ratified, there were no appeals from federal court convictions, *Griffin, supra*, 351 U.S. at 21, 76 S.Ct. at 591, and the states could provide whatever appeal rights they deemed appropriate. *McKane, supra*, 153 U.S. at 687–88, 14 S.Ct. at 914–15; *see Ortwein v. Schwab*, 410 U.S. 656, 660, 93 S.Ct. 1172, 1174, 35 L.Ed.2d 572 (1973). Thus, if analysis were limited to the state of the law at the time the Sixth Amendment was drafted and ratified, that amendment could not apply to a non-existent "appeal" period.

 Despite the historical absence of an absolute right of appeal, however, the courts have long recognized both state and federal constitutional rights to a speedy trial *after* a conviction has been set aside and the defendant reindicted. *See Ex parte Wells*, 45 Tex.Cr.R. 170, 74 S.W. 541 (1903); *Benton v. Commonwealth*, 90 Va. 328, 18 S.E. 282 (1893). In addition, state statutes requiring trial within a specified period after indictment (unless a defendant has sought postponement) have been applied after reversal of a conviction followed by reindictment. *See Yule v. State*, 16 Ariz. 134, 141 P. 570 (1914) (trial within 60 days after indictment); *Benton, supra* (trial "at same term at which indictment is found"). *See generally* Note 57 Colum.L. Rev. 846, 850 & n. 23 (1957). Thus, no one seriously can doubt the applicability of the Sixth Amendment once a conviction has been reversed and the case remanded for a new trial.

8. On July 27, 1978, Alston filed in this court a "Motion to Dismiss Second [*i. e.*, the present government] Appeal Because of Delay Since Decision of the First Appeal. Among his arguments in support of the motion was an allegation that, between this court's January 20 decision and Alston's April 24 speedy trial motion, "[t]he government took no steps . . . to accelerate the issuance of the mandate, assign the case to a judge, or bring it to trial." To the extent that this period includes post-appeal time subject to the Sixth Amendment right to a speedy trial (beginning with the issuance of this court's mandate on February 13, 1978), the contention has no merit because there was no undue delay. In contrast, the period January 20–February 13, 1978 is included within the appeal period and will be discussed accordingly.

after sentencing) and issuance of this court's mandate on February 13, 1978.

Appellee, *amicus*, and the trial court have characterized appellate delay as a Sixth Amendment issue. Implicitly, their theory is that all delay before ultimate resolution of a criminal charge—including delay incident to reversing an improperly obtained conviction—implicates the right to a "speedy trial." Put another way, there has been no "trial," within the meaning of the Sixth Amendment, unless and until a defendant has received a *fair* trial.

The courts which have considered appellate delay almost uniformly have rejected this proposition.[9] Some have done so based on Supreme Court authority that there is no constitutional right to a criminal appeal, *see* note 7 *supra*, from which it follows that "[t]he word 'trial' in the Sixth Amendment . . . does not include an appeal, but rather refers to a determination by the jury of guilt or innocence." *Doescher v. Estelle*, 454 F.Supp. 943, 949 (N.D.Tex.1978) (citing *Colunga v. State*, 527 S.W.2d 285 (Tex.Cr. App.1975); *Zanders v. State*, 515 S.W.2d 907 (Tex.Cr.App.1974), *cert. denied*, 421 U.S. 951, 95 S.Ct. 1685, 44 L.Ed.2d 106 (1975)). Other courts have reasoned, more directly, that the only purpose of the constitutional right to a speedy trial is to assure that an accused gets *to trial* promptly rather than wait interminably for a resolution of the charges. No additional right to a speedy trial is implied. *See Roberson v. Connecticut*, 501 F.2d 305, 310–11 (2d Cir. 1974) (Mansfield, J., concurring); *United States v. Cifarelli*, 401 F.2d 512, 514 (2d Cir.), *cert. denied*, 393 U.S. 987, 89 S.Ct. 465, 21 L.Ed.2d 448 (1968); *Petition of Williams*, 393 N.E.2d 353, 354 (Mass.1979); *State ex rel. Mastrian v. Tahash*, 277 Minn. 309, 312, 152 N.W.2d 786, 789 (1967); *State v. Lagerquist*, 254 S.C. 501, 505, 176 S.E.2d 141, 142 (1970), *cert. denied*, 401 U.S. 937, 91 S.Ct. 912, 28 L.Ed.2d 216 (1971). Still other courts, including the Supreme Court, without analyzing whether the Sixth Amendment applies, have held on the facts of a particular case that the delay attributable to a successful appeal had not deprived the defendant of the right to a speedy trial. *Harrison v. United States*, 392 U.S. 219, 221–22 n. 4, 88 S.Ct. 2008, 2009–10 n. 4, 20 L.Ed.2d 1047 (1968), *rev'g on other grounds*, 128 U.S.App.D.C. 245, 387 F.2d 203 (1967); *United States v. Robles*, 563 F.2d 1308, 1309 (9th Cir. 1977), *cert. denied*, 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978).

We agree that the Sixth Amendment does not apply to post-conviction appellate delay.[10] That amendment was adopted to assure that one accused of a crime is brought to trial promptly. *See Barker, supra*, 407 U.S. at 537, 92 S.Ct. at 2195 (White, J., concurring); *Marion, supra*, 404 U.S. at 315, 92 S.Ct. at 460. It does not

---

9. The United States Court of Appeals for the District of Columbia Circuit, however, has suggested, without holding, that the Sixth Amendment may be applicable to the post-conviction appeal period. *See United States v. Sarvis*, 173 U.S.App.D.C. 228, 234–35, 523 F.2d 1177, 1183–84 (1975); *but see Harrison v. United States*, 128 U.S.App.D.C. 245, 249–50, 387 F.2d 203, 207–08 (1967), *rev'd on other grounds*, 392 U.S. 219, 221–22 n. 4, 88 S.Ct. 2008, 2009–10 n. 4, 20 L.Ed.2d 1047 (1968). Additionally, in *People of Territory of Guam v. Olsen*, 462 F.Supp. 608, 613 (D.Guam App.Div.1978), the court apparently relied on the Sixth Amendment to dismiss an indictment where there had been a delay of more than two years in preparation of the trial transcript for appeal purposes ("[T]here has been much emphasis in the press and in the halls of Congress on the right to a speedy trial. . . . The same corollary rights are involved in the concept of speedy termination of appeals.") (Footnote omitted).

10. It is interesting to note that neither the American Bar Association (ABA) Standards for Criminal Justice, Speedy Trial (Approved Draft, 1968) nor the Speedy Trial Act, 18 U.S.C. §§ 3161 *et seq.* (1976) addresses the question of post-conviction appellate delay; they deal only with delay before trial, or after a mistrial, or grant of a new trial, or completion of a successful appeal or collateral attack. Neither the ABA Standards nor the Speedy Trial Act, however, purports to be coextensive with the Sixth Amendment right to a speedy trial, *see* 18 U.S.C. § 3173 (the Act is not a bar to any Sixth Amendment claim); and, in any event, the Standards and the Act do not apply in the District of Columbia. *See Day, supra* at 965 (discussing why the ABA and Speedy Trial Act exemptions for interlocutory appeal time do not apply).

guarantee, in addition, that the speedy trial clock continues to run during the pendency of one or more appeals until the trial assuredly has been fair.

■ This is not to say, however, that appellate delay is immune from constitutional scrutiny. To the contrary, if such delay would prevent a fair trial after reversal of a conviction, the Fifth Amendment right to due process is implicated.[11] Thus, the question becomes whether the Fifth and Sixth Amendments call for the same—or different—analyses when appellate delay is the issue.

■ At least one court found little, if any, conceptual difference between the two approaches. In *Doescher, supra,* the court adopted due process criteria for judging appellate delay virtually identical to those announced by the Supreme Court in *Barker, supra,* for speedy trial analysis and, similarly, called for the courts to "balance all of these factors." *Doescher, supra* at 947.[12] We do not agree that the two inquiries are virtually the same. During the pretrial period, four "speedy trial" factors are applied in a "balancing test," with none inherently preeminent. *See Barker, supra* 407 U.S. at 530, 92 S.Ct. at 2192; note 12 *supra.* In contrast, from a due process perspective, the one, indispensable concern during an appeal period is prejudice, since the focus shifts from a "speedy" to a "fair" trial.

In reaching this conclusion we note, by way of background, that the Supreme Court developed the distinction between a "speedy" and a "fair" trial when considering the constitutional implications of delay prior to arrest. In *Marion, supra,* the Court held that prearrest delay is outside the scope of the Sixth Amendment. *See United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *Nickens v. United States,* 116 U.S.App.D.C. 338, 323 F.2d 808 (1963). Noting that the history of the speedy trial provision "is sparse and unilluminating," *Marion, supra,* 404 U.S. at 314 n. 5, 92 S.Ct. at 460 n. 5, the Court concluded that the Sixth Amendment should be construed to "mean what it appears to say," *id.* at 314, 92 S.Ct. at 460, namely "that those *accused* of crimes should have their trial without undue delay." *Id.* at 315 n. 6, 92 S.Ct. at 460, n. 6 (emphasis added). This literal interpretation is reinforced, the Court said, by the fact that an arrest triggers a new dimension of prejudice. It "may disrupt [a citizen's] employment, drain his financial resources, curtail

---

11. *See, e. g., Roberson, supra* at 310–11 (Mansfield, J., concurring) (delayed hearing); *Tramel v. Idaho,* 459 F.2d 57, 58 (10th Cir. 1972) (delayed state court decision on appeal); *Dozie v. Cady,* 430 F.2d 637, 638 (7th Cir. 1970) (delayed filing of appellate brief); *Way v. Crouse,* 421 F.2d 145, 146 (10th Cir. 1970) (delayed state court docketing of appeal); *Smith v. Kansas,* 356 F.2d 654, 656 (10th Cir. 1966), *cert. denied,* 389 U.S. 871, 88 S.Ct. 154, 19 L.Ed.2d 151 (1967) (delayed state court adjudication of post-conviction remedy); *Doescher, supra* at 949–51 (delayed transcript); *People v. Ruhl,* 63 Cal.App.3d Supp. 6, 8, 134 Cal.Rptr. 62, 63 (1976) (delayed preparation of appeal statement); *Williams, supra* at 354–55 & n. 5 (delayed transcript); *Tahash, supra,* 277 Minn. at 311, 152 N.W.2d 788–89 (delayed transcript); *Lagerquist, supra,* 254 S.C. at 506, 176 S.E.2d at 143 (delayed transcript).

Although not determinative, it is interesting to note that in evaluating whether there is a constitutional right of appeal, the Supreme Court considered due process to be the proper framework for the inquiry. *See* note 7 *supra.*

12. In *Barker, supra,* 407 U.S. at 530, 92 S.Ct. at 2192, the Supreme Court prescribed a "balancing test" comprised of "four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant" (footnote omitted), whereas in *Doescher, supra* at 947, the court suggested balancing "(1) the length of the delay; (2) the reason or justification for the delay; (3) whether and to what extent the Defendant demanded a more rapid appeal; (4) any prejudice resulting to the Defendant by the delay (such as post-trial confinement, worry, and the desire to limit the possibility that the Defendant's appeal will be impaired); and (5) comity." (Footnote omitted). *Compare Williams, supra* at 355 ("a court has to consider the extent of the delay, its causes, its impact on the appellant, and the degrees of responsibility or fault attributable to the appellant on the one hand and the State on the other").

Many of the appellate delay cases are collateral attacks in federal courts against delays in state courts. Thus, in this context the "comity" factor becomes relevant. *See* note 11 *supra.*

his associations, subject him to public obloquy, and create anxiety in him, his family and his friends." *Id.* at 320, 92 S.Ct. at 463. It is for all these reasons, in addition to protecting against prejudice to an eventual defense of the criminal charge, that the right to a speedy trial is guaranteed.[13] *Id.* at 320–22, 92 S.Ct. at 463–64. Thus, "[t]he major evils protected against by the speedy trial guarantee exist *quite apart* from actual or possible prejudice to an accused's defense." *Id.* at 320, 92 S.Ct. at 463 (emphasis added).

In contrast, according to *Marion, supra,* when the government appears to have evidence suggesting probable cause but delays making an arrest, "a citizen suffers no restraints on his liberty and is not the subject of public accusation: his situation does not compare with that of a defendant who has been arrested and held to answer." *Id.* at 321, 92 S.Ct. at 464. The principal, more narrow concern in evaluating prearrest delay is prejudice to the defense against an eventual charge, since any delay from the date of the offense can impair memories or even result in the loss of witnesses or other evidence.[14] *Id.* at 321, 92 S.Ct. at 464. In the event that statutes of limitations do not

protect against such prejudice, Fifth Amendment due process is available, *Lovasco, supra,* 431 U.S. at 789, 97 S.Ct. at 2048; *Marion, supra,* 404 U.S. at 324, 92 S.Ct. at 465; *Ross v. United States,* 121 U.S.App. D.C. 233, 234, 238–39, 349 F.2d 210, 211, 215–16 (1965); but "this possibility of prejudice at trial is not itself sufficient reason to wrench the Sixth Amendment from its proper context" to supply an additional remedy. *Marion, supra,* 404 U.S. at 321–22, 92 S.Ct. at 464.

We believe that a similar analysis is well fitted to the appeal period. Although it is true that a criminal conviction, like an arrest, can be said to increase the drain on financial resources, extend curtailment of associations, reinforce public obloquy, and perpetuate anxiety, *cf. Marion, supra* at 320, 92 S.Ct. at 463 (pretrial delay), the conviction also can be said, in fairness, to rebut the presumption of innocence which underlies the right to bail, *see Stack v. Boyle,* 342 U.S. 1, 4, 72 S.Ct. 1, 3, 96 L.Ed. 3 (1951),[15] and, implicitly, underlies the right to a speedy trial. Thus, in a fundamental sense—absent pretrial delay—the conviction and sentencing have satisfied the interests of the defendant, as well as the pub-

---

**13.** A year later, the Court acknowledged that there is also a separate societal interest in a speedy trial attributable to legitimate concerns, for example, that dangerous individuals may be out on bail and that government witnesses may become unavailable or their memories fade. *Barker, supra,* 407 U.S. at 519–21, 92 S.Ct. at 2186–87. *See Dickey v. Florida,* 398 U.S. 30, 42, 90 S.Ct. 1564, 1571, 26 L.Ed.2d 26 (1970) (Brennan, J., concurring).

**14.** In *Marion, supra,* the Supreme Court could be understood to say that prejudice to the defense is the sole, not principal, concern from the prearrest delay. The majority did not acknowledge that the notoriety of an investigation could result in many of the same concerns that eventual arrest and indictment will cause. *See id.* at 330–31, 92 S.Ct. at 468–69 (Douglas, J., concurring).

**15.** The "fundamental right to bail," *Schilb v. Kuebel,* 404 U.S. 357, 365, 92 S.Ct. 479, 484, 30 L.Ed.2d 502 (1971), has a statutory origin, the Judiciary Act of 1789, 1 Stat. 73, 91, *see Stack, supra,* 342 U.S. at 4, 72 S.Ct. at 3, and is reinforced by the Eighth Amendment prohibi-

tion against "excessive bail," *see Schilb, supra* 404 U.S. at 365, 92 S.Ct. at 484. Because a conviction erases the presumption of innocence underlying these rights, they do not survive during the appeal period. "The importance attached to conviction is due to the underlying principle that bail should be granted only when it is uncertain whether the accused is guilty or innocent of the crime charged, and that such uncertainty is removed by conviction, the presumption of innocence existing upon application before conviction being rebutted." 4 Wharton's Criminal Law and Procedure § 1824 at 667 (Anderson 1957) (footnotes omitted). This "underlying principle" is reflected in the District of Columbia bail statute. *Compare* D.C.Code 1973, § 23–1322 (governing detention prior to trial) *with* D.C.Code 1973, § 23–1325(b)–(d) (governing release after conviction). *See* D.C.App.R. 9(b). *But cf. Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 1870–71, 60 L.Ed.2d 447 (1979) (presumption of innocence has no application to a determination of a pretrial detainee's rights during pretrial confinement).

lic,[16] in a speedy trial, and the burden of persuasion on appeal has shifted from the state to the defendant. The variety of concerns of a defendant who has been accused but never brought to trial has been dispelled in the case of a defendant who has had the opportunity to stand trial. Thus, judicial consideration of the appeal period does not require the kind of emphasis on delay as such that the Sixth Amendment imposes on the period between ·arrest and trial. It follows that, once again, there is one, predominant concern when a defendant faces appellate delay: prejudice to the ability to defend against the charge in the event of a second trial.

In summary, if we were to graph the overall analysis of the period from the time of the offense to the reversal of the conviction, we would draw a bell-shaped curve, as follows: Any inordinate delay between the offense and arrest (or other accusation) suggests possible prejudice to the defense— solely a due process concern at the beginning of the curve. Once the defendant has been formally accused, however, there are additional concerns—financial impact, public obloquy, attendant anxiety—requiring the addition of speedy trial protections that emphasize the length of delay, as such, as well as demonstrable prejudice. After conviction, these pretrial concerns, while still present, must be said to ebb as a constitutional matter, since the conviction is presumptively valid. Because the burden to show error now rests on the defendant, due process alone remains to protect the defendant at the end of the curve, in the event that the time taken to reverse on appeal has jeopardized the fairness of a retrial.[17] We

turn, therefore, to the due process inquiry, both generally and as applied to this case.

### III. *The Due Process Inquiry*

■ · A. To determine whether a retrial would violate the right to due process, the trial court must (1) evaluate the impact of the appeal period on the appellant.[18] *If* the impact has been prejudicial, the court shall (2) decide whether the relationship between (a) the nature and severity of the prejudice and (b) the government's alleged responsibility for it by delaying the appeal, warrants dismissal of the information or indictment under the Fifth Amendment. *See Lovasco, supra,* 431 U.S. at 789–90, 97 S.Ct. at 2048–49; *Williams, supra* at 355.

■ Several aspects of this approach should be addressed. First, prejudice to a fair retrial is not necessarily congruent with the prejudice attributable to denial of a speedy trial. Prejudice to defense preparation, of course, is obviously a factor in common; and, under some circumstances, incarceration can implicate due process, as well as the right to a speedy trial, but its adverse impact on the ability to prepare for trial. *See Day v. United States,* D.C.App., 390 A.2d 957, 972 (1978). Nonetheless, we cannot say categorically that the right to a fair trial will be affected by a defendant's incarceration let alone by anxiety—two types of prejudice given Sixth Amendment significance. *See Barker, supra,* 407 U.S. at 532–33, 92 S.Ct. at 2193.[19] We therefore leave to case-by-case analysis the determination of the kinds of· prejudice relevant to considering whether a retrial would offend due process.

**16.** *See* note 13 *supra.*

**17.** Analytically, therefore, the periods before trial (Sixth Amendment), during appeal (Fifth ·Amendment), and after reversal or mistrial (Sixth Amendment), require different constitutional analyses, respectively. Because the alleged pretrial and post-remand delays in this case, even when taken together, do not suggest a speedy trial violation, we do not have occasion to consider Fifth and Sixth Amendment · claims in conjunction.

**18.** The appeal period covers the time that begins with filing the notice of appeal, and extends through preparation of the transcript, briefing, docketing for submission or argument, consideration by the division or the en banc court, and issuance of the court's decision and mandate.

**19.** The Supreme Court has stated that, even under the Sixth Amendment, prejudice to defense preparation is the "most serious" form of prejudice. *Barker, supra* at 532, 92 S.Ct. at 2193.

 Second, in calling for evaluation of the impact of the appeal period on the appellant, we intend an evaluation of prejudice arising at any time after the notice of appeal has been filed. The trial court, however, eventually may conclude that identifiable prejudice has arisen so early during the appeal period that it cannot properly be attributed to "delay"; but that determination cannot accurately be made until all possible prejudice has been identified. Thus, the trial court should proceed to the second inquiry if any prejudice is demonstrated.[20]

 Third, some prejudice can be so unrelated to a fair retrial—or in any event so minimal—that the court may find the nature and/or severity of the prejudice insufficient to justify further inquiry into the government's alleged responsibility for prejudicial "delay."

 Finally, if the trial court finds prejudice during the appeal period sufficient to trigger an inquiry as to whether government "delay" is responsible, the nature of that inquiry will depend on the type of government delay alleged. If, for example, the alleged delay stems from a missing transcript, or from this court's processing in the clerk's office, or from continuances in the briefing schedule, then the reasons for the time taken can be checked easily and used objectively to evaluate whether, under the circumstances, the government should be held responsible for taking too long. But if the alleged delay, as in this case, is attributable primarily to the period when this court has taken the case under advisement, an objective evaluation would be virtually impossible. The circumstances are likely to be complex, even elusive; but even more fundamentally, at least two institutional considerations inherently contribute to the likelihood of a substantial period of deliberation (or at least a longer period than a trial court is likely to take when a matter of some complexity has been argued).

First, there is the need for several judges at the appellate level to collaborate on a satisfactory disposition, with the attendant possibilities of initial disagreement, post-argument debate, revisions of draft opinions, changes of mind, and even dissent. Second, the appellate court's lawmaking function—the process by which precedents are reconsidered and rules are developed—is inherently time-consuming, for the court must consider the potential impact of its decision beyond the case at issue.

 These factors do not always cause delay—indeed, the latter one is not always present—but it is true, nonetheless, that the deliberative process on appeal has dimensions which legitimately can require substantial time in addition to any delay attributable simply to the volume of cases on the docket.[21] In light of these institutional considerations, as well as the complexity of evaluating the reasonableness of deliberation time for any particular case, we believe it would be inappropriate and counter-productive to permit scrutiny of the deliberative period. Accordingly, in the event that the length of appellate deliberation becomes material to determining whether prejudice is fairly attributable to the government and, if so, is sufficient to warrant dismissal, objective norms will have to be established defining a generally-acceptable timetable for appellate decision-making, such that "delay" for due process purposes begins to run once that time frame has been exceeded.[22]

---

**20.** This case only concerns the possibility of dismissing an indictment or information on due process grounds if government-caused, prejudicial "delay" during the appeal period would preclude a fair retrial. We intimate no opinion on the question whether government-caused prejudice during the appeal period, unrelated to delay, could warrant dismissal of the case under certain circumstances.

**21.** The deliberateness inherent in the appellate process is akin to that in the investigative stage prior to arrest, in the sense that the defendant as well as the government have a profound interest in the care used to evaluate the matter. Thus, delay is not one-sided. *See Lovasco, supra,* 431 U.S. at 795, 97 S.Ct. at 2051.

**22.** As indicated in *Day, supra* at 968 n. 4, "[w]e consider the time periods set forth in our Internal Operating Procedures to be goals, without

B. With this background we turn, now, to the facts of this case. The period between notice of appeal (May 8, 1975) and this court's mandate (February 13, 1978) was divided as follows:

| | | |
|---|---|---|
| notice of appeal to filing of transcript | May 8–June 24, 1975 | 1½ months |
| filing of transcript through briefing to oral argument | June 24, 1975– March 18, 1976 | 9 months |
| oral argument to decision and order by three-judge division | March 18, 1976– January 20, 1978 | 22 months |
| decision and order to issuance of mandate | January 20– February 13, 1978 | ¾ month |
| | | 33¼ months |

The trial court noted that, because of the time taken on appeal, Alston had been "incarcerated for approximately thirty months" (including almost 24 months after he filed a notice of appeal). The court acknowledged that this incarceration stemmed from the revocation of Alston's probation for a prior offense, and that his sentence for that offense was to run concurrently with the sentence in this case. The court nonetheless found the prejudice from incarceration attributable to appellate delay in this case, since "[t]he revocation of his probation . . . occurred only after his subsequently reversed conviction in the instant case."

 Even if we assume, without deciding, that Alston's incarceration could contribute to a violation of due process,[23] this finding of prejudice is "plainly wrong." D.C.Code 1973, § 17–305(a). Although it is true that Alston's probation for a prior offense was not revoked until May 9, 1975, after he had been convicted and sentenced on the charge underlying the present case, it is also true that the conviction itself triggered the revocation, see D.C.Code 1973, §§ 24–205, 24–206, which would have occurred without regard to the length of the appeal. In order for Alston's claim of prejudice from incarceration to have force,

therefore, we would have to accept the proposition that Alston could have sustained the burden of convincing the authorities that he should be (1) paroled on the prior offense immediately upon this court's (earlier) reversal of his conviction in the present case, see D.C.Code 1973, § 24–204, and (2) released pending retrial in this case, see D.C.Code 1973, § 23–1321—results which are far from automatic. More than likely, Alston would have remained incarcerated because of the prior and/or present charges. We cannot assume to the contrary. The question then becomes whether, if there had been a more rapid appellate process, Alston could have expected retrial and release, *if acquitted*, before April 1977, when he actually was paroled. Although it is possible that this court's decision followed by retrial, acquittal, and release could have occurred before April 1977 (23 months from the date of conviction), that is a speculative proposition. We cannot conclude that Alston was prejudiced from incarceration based on that mere possibility.

Accordingly, because there is no demonstrable relationship between Alston's incarceration and his appellate delay claim, this trial court finding of prejudice cannot stand.

 The trial court found a second kind of prejudice: appellant "may no longer be eligible for sentencing under the Youth Corrections Act if he is convicted following a second trial" [Finding 13]. Loss of the opportunity to be considered for youthful offender treatment is prejudice of a sort germane to speedy trial analysis. *See United States v. Roberts*, 515 F.2d 642, 646 (2d Cir. 1975). Even if we assume, for the sake of argument, that prejudice to sentencing or other dispositional alternatives is germane to due process analysis, we perceive no such prejudice here. Alston turned 22 in January 1976, seven months into the appel-

---

binding or constitutional significance." Because no prejudice warranting relief to Alston can be attributed to the time taken by this court to decide his appeal, we do not need to establish here the objective norms—the generally acceptable timetable—for defining and evaluating appellate "delay."

**23.** There was, however, no trial court finding that incarceration bred inferior defense preparation or otherwise could be said to violate due process. *See* text at note 19 *supra*.

late briefing period. Thus, it is most unlikely that this court, under the best of circumstances, could have acted expeditiously enough to save his Youth Corrections Act eligibility, *see* 18 U.S.C. §§ 5006(d), 5010 (1976), and there is no evidence that Alston called the problem to this court's attention.[24] Accordingly, the finding of prejudice from possible ineligibility under the Youth Corrections Act is also "plainly wrong." D.C.Code 1973, § 17–305(a).

 It is important to note, finally, that although the trial judge alluded generally to the "usual fading memory" of witnesses, he did not find specific prejudice to defense preparation from the delay. In fact, the very basis for Alston's earlier successful appeal—a request to use the record of co-defendant Burton's plea-hearing testimony at trial—reflects evidence which is still available for use in its original form. *See United States v. Sarvis*, 173 U.S.App.D.C. 228, 233, 523 F.2d 1177, 1182 (1975).[25]

 We are therefore left with only the trial court's finding that Alston "has suffered an undue amount of anxiety and concern because of the delay" since the first trial—a finding we accept. *See* D.C.Code 1973, § 17–305(a). The question then becomes whether anxiety and concern, without more, are enough to implicate due process.

We conclude that emotional distress, when derived primarily from a lengthy period of appellate deliberation, does not in itself constitute prejudice sufficient to offend due process. It cannot be related to the constitutional guarantee of a fair retrial. Moreover, if the appropriate length of appellate deliberation had to be tested by reference to a particular appellant's generalized anxiety, the appellate court would have no reliable guide, and its priorities could not be rationally ordered.[26]

### IV. *Conclusion*

We perceive no violation of Alston's Sixth Amendment right to a speedy trial. Nor is there sufficient prejudice to warrant dismissal of the indictment under his Fifth Amendment right to due process. Accordingly, we reverse and remand for reinstatement of the indictment.[27]

*So ordered.*

MACK, Associate Judge, dissenting, with whom KELLY, Associate Judge, joins:

I would affirm the ruling of the trial judge dismissing the indictment for lack of a speedy trial.

Given another analysis by the majority I might agree that appellate delay is not a factor to be taken into consideration in determining when the right to a speedy trial has been denied under the Sixth Amendment. I obviously could not disagree that the Fifth Amendment right to due process is implicated when appellate delay would prevent a fair trial after reversal of a conviction. However, I find *no* meeting ground with the majority at the

---

24. This court has no formal procedure for expediting post-conviction review once the case has been taken under advisement, but it is not uncommon for counsel to inform the court of circumstances suggesting the need for an expedited decision.

25. Alston argued in his reply to the government's opposition to his motion to dismiss the indictment, and again on appeal, that because of the passage of time, neither he nor his family would be able to testify convincingly at a retrial. At the first trial, however, Alston's counsel told the court that Burton's testimony would comprise his sole defense. *Alston, supra* at 309–10. Thus, the trial court appropriately did not give much weight to the fading memories of witnesses.

26. Alston also argued in connection with his motion to dismiss the indictment, and stresses again at this time, that the government unconscionably caused delay of his appeal by deliberately concealing the transcript of co-defendant Burton's plea hearing testimony until August 25, 1975. The trial court made no finding with respect to this allegation. Because Alston makes no proffer as to how this fact, even if true, would add to prejudicial impact on a retrial, we find no merit to the contention.

27. Alston also has argued that this case must be dismissed on grounds of double jeopardy and mootness. Neither contention has merit.

point where, having raised the spectre of fundamental "due process" considerations, it relegates such considerations to a status requiring less scrutiny than that advanced for "speedy trial" considerations (witness the bell-shaped curve with ebbing ends). To me the issue of a fair trial—which certainly may embrace a speedy one—is so basic that, once subject to question, deserves scrutiny of the strictest kind.

Mr. Alston was arrested in October 1974. He was released on parole in April 1977. On July 1, 1978 the trial court dismissed the indictment which the court today reinstates. The pendency of appellate proceedings, regardless of their significance for Sixth Amendment purposes, has been instrumental in helping to place Alston's hopefully "free-from-error" trial almost six years beyond the date of his arrest.

Under the majority's analysis the determination of whether this trial can be, for due process purposes, a fair one must be made on a case-by-case basis. The key factor for evaluation is relevant prejudice (which to me means prejudice to the defendant). I do not see how prejudice to a defendant or a defense can be evaluated without reference to the lapse of time between the arrest (as opposed to the date of the notice of appeal) and the date of the new trial. Simply stated, the problem with the majority's analysis is that its preoccupation with segmented time periods clouds the ultimate question—is the retrial fundamentally unfair because of the cumulative effect of *all* the delays, including the appellate delay? To break the time periods down and try to assign responsibility or fault for each one before the prejudice can be shown begs the question. In a due process analysis, unlike a speedy trial analysis, the question is not whether there was legitimate reason for the delay, or to whom it is assigned, but whether the overall impact of that delay, coupled with other delays, is to deny the defendant a fair trial after·remand. The focus on the reasons for appellate delay and the prejudice arising solely at that time, shifts attention away from both the critical issue—prejudice as a result of delay—and the critical point in time—that of retrial.

Moreover, since prejudice is the sole determinative factor in a due process analysis, I would think it must be ascertained at the critical point in time, under the applicable standard, by the trial court in the first instance. I question whether we are in a position to say that the findings of Judge Hess, made in accordance with the speedy trial *Barker v. Wingo* * test, are "plainly wrong" under another standard of evaluation. I also question whether we, in deciding a second appeal (this brought by the government),·can find from our vantage point that appellant would have suffered no prejudice at the time of the retrial we have made possible. It seems to me that this would be a decision, again for the trial court under guidelines suggested by this court.

Finally, our decision today creates simply too much confusion in requiring our courts to meet speedy trial challenges by separate evaluations, under separate standards, using separate dates, for trial and appellate purposes. While the majority graphically and convincingly describes the institutional considerations that make appellate litigation distinct from trial litigation, I would for the purposes of this case, at least, accept the speedy trial analysis of the trial judge.

I respectfully dissent.

---

* *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).