UNITED STATES, Appellant,

v.

Joseph P. DONALDSON, Appellee.

No. 81–64.

District of Columbia Court of Appeals.

Argued Oct. 27, 1981.
Decided Sept. 15, 1982.

Peggy M. Tobolowsky, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the case was argued, John A. Terry, Asst. U. S. Atty., Washington, D. C., at the time the case was argued, and Timothy J. Reardon, III, Mark J. Biros, David S. Krakoff, Asst. U. S. Atty., and John J. McDermott, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellant.

Charles S. Carroccio, Jr., Washington, D. C., appointed by this court, for appellee.

Before NEBEKER, MACK and PRYOR, Associate Judges.

NEBEKER, Associate Judge:

A jury convicted Joseph P. Donaldson of second-degree murder while armed. D.C. Code 1973, §§ 22–2403, –3202. However,

following hearings on Donaldson's motion to vacate sentence, D.C.Code 1973, § 23–110, Judge Nunzio held that the trial court's pretrial inquiry into Donaldson's assertions of ineffective assistance of counsel lacked the requisite scope of findings. He ordered a new trial. The case then came on for trial before Judge George H. Revercomb who found that Donaldson's alibi defense had been prejudiced by the delay. He dismissed the indictment eschewing a speedy trial basis but grounding the ruling on fair trial—due process. The government appeals and we reverse.

## I

Because of the particular posture of this case, it is necessary to discuss the events and procedures leading to dismissal. At approximately 7:00 p. m. on October 27, 1974, Steven McDonald was stabbed during a robbery attempt and within hours died of his injuries. Harry Neal, his brother David Neal, and Robert "Chickie" Green were indicted for first-degree murder. The case against Green was severed from the other defendants, and the Neal brothers were brought to trial. On January 23, 1976, Harry Neal was found guilty of aiding and abetting another in the commission of a felony murder and was sentenced to the mandatory term of twenty years to life.[1] David Neal was acquitted of all charges. Pursuant to a plea bargain with the government, Green pleaded guilty as an accessory after the fact to manslaughter. It was Green's August 17, 1976, grand jury testimony which implicated Joseph P. Donaldson in the stabbing death of McDonald.[2] Donaldson was arrested within 24 hours of Green's testimony.

A five-count indictment was filed against Donaldson on September 22, 1976, and the following day his court-appointed counsel moved for a reduction in bond which was denied. On November 5, the trial court received a letter from Donaldson in which

he asserted that his attorney was not working to further his defense and had failed to interview a list of alibi witnesses provided by his friend. Donaldson asked the court to appoint new counsel. At a status hearing on November 10 defense counsel was shown a copy of Donaldson's request. The trial was set for March 23, 1977, but rescheduled for September 13 at defense counsel's request. On May 3, 1977, Donaldson wrote a second letter to the court complaining of his counsel. The court treated that letter as a *pro se* motion for replacement of counsel, and, following a hearing on May 10, the motion was denied.

Following a two-day trial, the jury found Donaldson guilty of second-degree murder while armed. D.C.Code 1973, §§ 22–2403, –3202. Donaldson's single defense was an alibi that he was helping his mother remove water from a flooded trash chute in an apartment building she managed. However, the only testimony offered in Donaldson's defense was his brief statement as to his whereabouts at the time of the slaying. Although his mother was present at the trial and had told the defense attorney of her desire to testify, she was not called as a witness. Several other available corroborating alibi witnesses were similarly not called to testify. On November 10, Judge Nunzio sentenced Donaldson to a term of imprisonment from fifteen years to life. Following his conviction, Donaldson filed a timely notice of appeal and this court appointed new counsel.

On June 21, 1978, Donaldson's new counsel filed a motion to vacate sentence, D.C. Code 1973, § 23–110, charging ineffective assistance of prior counsel. Three hearings were held with both sides offering testimony and submitting extensive pleadings. On April 2, 1979, Judge Nunzio issued a memorandum opinion in which he held that because the trial court's pretrial hearing of May 10, 1977, was defective in scope and

1. Harry Neal was later granted a new trial based on information provided by a newly discovered witness, *United States v. Neal,* 105 Wash.D.L.Rptr. 1393 (Aug. 4, 1977), and he

subsequently pleaded guilty to attempted robbery.

2. Donaldson's name was first mentioned at the Neal trial in January 1976.

lacked a record inquiry on the complaints about counsel with appropriate findings of fact, he had failed to comply with the requirements of *Monroe v. United States,* D.C.App., 389 A.2d 811 (1978) and *Farrell v. United States,* D.C.App., 391 A.2d 755 (1978).[3] Judge Nunzio did not address the issue of effectiveness of counsel although much of the testimony dealt with that issue as it related to available corroboration of the alibi. The trial judge advised the Court of Appeals, (*Smith v. Pollin,* 90 U.S.App. D.C. 178, 194 F.2d 349 (1952)), that if the case were remanded to the trial court, he would order a new trial.[4] Donaldson's motion for a new trial was granted on April 30.

Following a reduction in his bond on June 8, 1979, Donaldson was released from custody. Trial was ultimately set for November 25, 1980, after defense counsel requested several continuances. On October 2, 1980, counsel submitted a motion to dismiss for lack of a speedy trial. Judge Revercomb heard the motion and on November 25 dismissed the indictment holding that Donaldson had not been denied a speedy trial[5] but that a retrial would violate his right to due process under the Fifth Amendment. The court, appearing to recognize that ineffectiveness of counsel was inextricably intertwined in the case, focused the due process inquiry on whether the trial court's dismissal of Donaldson's pretrial request for new counsel prevented the full development of an alibi defense.[6] The court viewed Donaldson's incarceration as prohibiting him from interviewing the alibi witnesses. It found that the witnesses could then no longer clearly remember the events that occurred on the day of the slaying, which reduced Donaldson's defense to an uncor-

3. *Monroe v. United States, supra* at 821, defined the court's duty as follows:

> When a defendant makes a pretrial challenge to the effectiveness of counsel—whether court-appointed or retained—and requests the appointment of new counsel on the ground that counsel, due to lack of investigation, preparation, or other substantial reason, is not rendering reasonably effective assistance, the trial court has a constitutional duty to conduct an inquiry sufficient to determine the truth and scope of the defendant's allegations.

> The inquiry must be *"on the record"* and the court must make appropriate findings of fact *"of record"* sufficient to permit meaningful appellate review. *Id.* (emphasis in original).

4. *Monroe, supra* and *Farrell, supra* were decided after the Donaldson conviction; however, the issue of whether Judge Nunzio was correct to apply them retroactively is not necessary for decision and, therefore, will not be addressed. *Cf. Stovell v. Denno,* 388 U.S. 293, 297–99, 87 S.Ct. 1967, 1970–1971, 18 L.Ed.2d 1199 (1967); *Linkletter v. Walker,* 381 U.S. 618, 622–29, 85 S.Ct. 1731, 1733–1737, 14 L.Ed.2d 601 (1965); *Gaffney v. United States,* D.C.App., 421 A.2d 924, 927 n.3 (1980).

5. Judge Revercomb treated Donaldson's five bond review motions, the first of which was filed on September 23, 1976, as the equivalent of motions for speedy trial, *Branch v. United States,* D.C.App., 372 A.2d 998 (1977), and ordered a hearing. He then found that the total delay under a Sixth Amendment analysis was two years and four months, from Donaldson's arrest (August 17, 1976) until his sentencing (November 10, 1977) and from Judge Nunzio's opinion requesting a remand (April 2, 1979) until Donaldson waived his right to a speedy trial (May 9, 1980). Judge Revercomb held that only one two-month delay was directly attributable to the prosecution, and that the delay was in good faith. Applying *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), Judge Revercomb held that Donaldson was not denied a speedy trial; however, he deferred his discussion of delay-caused prejudice for a due process analysis.

6. Judge Revercomb correctly stated that *United States v. Alston,* D.C.App., 412 A.2d 351 (1980), does not apply in this case because the delay was not caused by lengthy appellate review. Following his conviction, Donaldson filed timely notice of appeal on November 11, 1977, and this court appointed new counsel who then requested additional time to submit his brief and obtain the trial transcripts. On June 21, 1978, defense counsel filed his motion to vacate sentence and subsequently requested and received several additional extensions of time for filing his appellate brief pending the outcome of his motion in the trial court. On April 24, 1979, pursuant to Judge Nunzio's decision to grant a new trial, the case was remanded to the trial court. Judge Revercomb found that there was little government-caused delay throughout the entire proceeding. Of the total 72 months it took to bring Donaldson to trial, from the date of the stabbing (October 27, 1974) until the day of the hearing before Judge Revercomb, he classified only nine months as government-caused.

roborated alibi involving his family. Accordingly, it was held the delay was prejudicial and the indictment was dismissed. The court stated that "it appears that the nature of the prejudice, blotting out a substantial defense, and its inherent severity is attributable to the government as a result of the summary disposal of the defendant's request for new counsel."

## II

The touchstone for our review in this case is well stated in *United States v. Lovasco,* 431 U.S. 783, 790, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977):

> We are to determine only whether the action complained of—here, [retrying the accused after granting his new trial request based on an inadequate and untimely inquiry into complaints about his lawyer]—violates those "fundamental conceptions of justice which lie at the base of our civil and political institutions," . . . and which define "the community's sense of fair play and decency." [Citations omitted.]

So fundamental is our inquiry that we "are not free, in defining 'due process,' to impose on law enforcement officials our 'personal and private notions' of fairness and to 'disregard the limits that bind judges in their judicial function.'" *Id.*

In reaching its conclusion, the trial court examined not only Donaldson's claim that his alibi defense had been blotted out but also five factors it identified as elements in the delay-prejudice "calculus." We examine those five factors separately because we are unable to agree that the analysis is capable of forming a basis upon which to predicate the necessary prejudice for a due process-undue delay conclusion. This is not a matter of deference to the trial court's vantage. It, like this court, reviewed a record of earlier proceedings. Our task is to determine whether the order dismissing the indictment was plainly wrong under D.C.Code 1981, § 17–305. We find it so for the following reasons.

The first three factors found to have relevance to prejudice are best characteriz-ed unitarily as a "weak" prosecution case. That case was first viewed as one consisting basically of "a one, perhaps two, witness identification." However, the record of the trial shows that the government produced several witnesses. Robert Smith testified that he was accompanying Donaldson at the time of the incident and testified that he saw Donaldson stab McDonald in the stomach. Robert "Chickie" Green stated that Donaldson was closest to McDonald at the time of the stabbing, and Green's wife, Yvonne Green, testified that shortly after the incident she heard Donaldson say that he had not meant to stab McDonald so hard. Yvonne Green also testified that Donaldson made the statement while he and Robert Green were in the basement of the Green's home, and that when she went down to speak with them she saw a large butcher knife. About forty-five minutes later, Yvonne Green saw Robert Green give the knife wrapped in a paper bag to Martina Stewart. Stewart testified that she received the bag from Green on the evening of the slaying and hid it in the basement of her home. She stated that Donaldson came to her home the next day to retrieve it. Quantitatively, the case was far stronger than the trial court viewed it.

█ The case was then viewed as weak because some government witnesses were drug addicts or convicted felons and the prime witness was an admitted heroin addict who had consumed a half-pint of whiskey on the day of the killing and admitted to lying before the grand jury. We fail to see how a weak case, or one in which the prosecution witnesses are far from virtuous can tolerate less delay in evaluating prejudice than one where the case is strong or the witnesses quite respectable. Whatever "prejudice" may be found in a "weak" case, it cannot be said to have legal relevance to a due process delay question. "Strong" cases simply cannot indulge more delay, while weak ones must be tried promptly. To be sure, complex cases may occasion more delay than simple ones, *Barker v. Wingo, supra,* but that notion does not permit an evaluation of the case in terms of

witnesses from one side coming from a seedy culture and from different stratum on the other side. Indeed, no such concept finds room in a speedy trial analysis and it should not in this kind of inquiry. Were the law otherwise, a due process-delay or speedy trial claim could be rejected if the prosecution were strong and based on testimony of witnesses of great character and the defense based on testimony of addicts, felons and liars.

Additionally, the trial court held that the two-year delay between the slaying and Donaldson's arrest resulted from the "government's choice in prosecuting the wrong individuals." This is a misassessment, for it should be remembered that two of the three individuals prosecuted subsequently pleaded guilty to related offenses. Furthermore, Donaldson was arrested the day after Robert Green's grand jury testimony implicating him in the murder. Good faith pre-arrest delays do not deprive an accused of due process. *See United States v. Lovasco, supra; United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). Accordingly, we find this factor to be of no value in the analysis.

Finally, the trial court deemed the jury deliberation process to evidence that it found the case to be a "close case." Since the reasons why juries have difficulty in deciding some cases can vary from the rational to the inexplicable and often cannot be ascertained, we think it too dangerous one way or another to consider this factor on the question of prejudicial delay. Thus, we conclude that the trial court's underlying rationale for identifying these five factors for its prejudice analysis was erroneous.

## IV

In order for an accused to maintain a due process claim based on delay of trial, he must demonstrate that the pretrial delay caused a substantial prejudice to his right to a fair trial, and that the delay was an intentional device to gain a tactical advantage over him. *United States v. Lovasco, supra,* 431 U.S. at 790, 97 S.Ct. at 2048; *United States v. Marion, supra; Smith v. United States,* D.C.App., 414 A.2d 1189, 1195 (1980); *Shreeves v. United States,* D.C. App., 395 A.2d 774, 782 (1978), *cert. denied,* 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979); *Tolliver v. United States,* D.C.App., 378 A.2d 679, 681 (1977). As to the latter, there can be little question that Donaldson failed to demonstrate that any government-caused delay was the result of an intent to gain a tactical advantage over him. This indictment was dismissed after Judge Nunzio's conclusion that the trial court's investigation into Donaldson's pretrial request required a new trial. *See supra,* note 4. We must first differentiate between the government—qua prosecutor—and the broader meaning, including the judiciary. Clearly, in the broader sense the government's intent was not ulterior. On the contrary, the solicitude for Donaldson's rights has been carried to the extreme. Moreover, it is obvious that the prosecution sought and received no tactical advantage from the delay. The most that can be said for the delay is that it was caused by retroactive application of new decisions of this court; *Monroe* and *Farrell, supra.* This cannot even be classified as negligence in the way *Smith v. United States, supra* treated that term. *Id.* Even if it be assumed that the trial court erred in its pretrial inquiry into protests about counsel,[7] the court failed only in clairvoyance. There was no negligence.

It is well established that investigative delays do not deprive an accused of due process even if his defense might be somewhat prejudiced by the lapse of time.[8]

7. *See supra* note 3.

8. The delay prior to Donaldson's arrest was clearly the result of an on-going police investigation into the stabbing death of McDonald. A plea bargain with Robert Green finally provided police with grand jury testimony implicating Donaldson, and he was arrested within 24 hours. During his pre-arrest period, Donaldson knew that individuals close to him were being investigated about the McDonald murder. Robert Green is a brother-in-law to Donaldson

*Lovasco, supra* 431 U.S. at 796, 97 S.Ct. at 2051; *Smith, supra* at 1195–96; *Shreeves, supra* at 782; *United States v. Cerrito,* 612 F.2d 588, 593 (1st Cir. 1979); *United States v. Rubin,* 609 F.2d 51, 66 (2d Cir. 1979). Donaldson did not assert that the government's pre-arrest delay violated due process. Rather, he argued that the long-term effects of all delays plus the dismissal of his pretrial protests about counsel denied him a fair trial. It follows that absent a showing of substantial or severe prejudice, a pre-arrest delay which satisfies due process cannot be amalgamated to later delays in order to base a Fifth Amendment violation.

■ In his attempt to show prejudice, Donaldson directed the court to the earlier hearings on his motion to vacate sentence,[9] and claimed that he was prejudiced because his alibi witnesses could then no longer recall the events of October 27, 1974. However, the transcripts of those hearings do not reflect such a dimming of the witnesses' memories nor a loss of his alibi defense. Donaldson testified that on the day of McDonald's slaying, he was home watching the Washington Redskins on television until approximately 6:30 p. m. when he received a telephone call from his mother, Pauline Boykins, who asked him to assist her with a flood in the apartment building she managed. He stated that he dropped his wife and daughter off at their cousin's home and arrived at his mother's building between 7:00 and 8:00 p. m. When he arrived, he put on his brother's boots and cleaned up the flood near the trash chute. He borrowed a mop and pail from Shelby Stephens, a resident who assisted him in the cleanup, and he discussed the flood with another resident, Cecilia Galloway. After he finished, Donaldson joined his mother and aunt, Emma Bryant, for a drink and then left the building at 11:30 p. m.

Pauline Boykins testified that on a Sunday before the end of October she called Donaldson to assist with a flood in her building, and that he arrived at approximately 8:00 p. m., put on some boots, cleaned up the water, had a drink with her and her sister, and left. Although Emma Bryant was not certain of the exact date, she did recall that she was present at her sister's apartment when a flood began in the first-floor trash compressor, that Donaldson arrived late in the afternoon or early evening, put on some boots, cleaned up the flood, and then had a drink with her and her sister. Allen Boykins, Donaldson's brother, testified that on a Sunday evening around October 27, Donaldson arrived at approximately 7:30 p. m. to assist with a flood in the building and that he borrowed a pair of boots to wear. Shelby Stephens remembered that on a Sunday in the latter part of September or October, she was awakened in the morning[10] by Donaldson and lent him a mop and pail to clean up a flood on the first floor of her apartment building. She recalled that the cleanup operation lasted into the evening. Cecilia Galloway was not sure of the date, but she did recall seeing Donaldson help his mother clean up a flood on the first floor of her apartment building.

Any loss in the memory of these corroborating witnesses has not prejudiced Donaldson's alibi defense sufficient to warrant the drastic remedy of dismissal.[11] It can be

and to Harry and David Neal, the persons tried for the murder in January 1976. Green, his wife Yvonne Green, and Harry Neal all testified for the government at Donaldson's trial, and stated that they discussed the police investigations into the case with Donaldson prior to his arrest. They testified that they asked Donaldson what he planned to do about the investigations. Furthermore, Donaldson's name was connected with the offense during the Neal trial.

9. Those hearings were held on October 27, 1978, and November 21, 1978.

10. Stephens also submitted an affidavit in which she stated that Donaldson helped his mother clean up the flood during the evening hours.

11. The testimony given at the hearings was available and subject to use to refresh the witnesses' memories, or other appropriate purpose. *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

seen from the testimony at the hearings that the alibi defense can be presented in a meaningful way. That is all the Fifth and Sixth Amendments require. To hold otherwise here places the Fifth and Sixth Amendments in friction with the well-settled law that courts must favor the trial process as our best tool in the quest for truth. Therefore, because delay is not shown impermissibly to have prejudiced Donaldson's right to a fair trial, the order dismissing the indictment is reversed and the case is remanded with instructions to reinstate the indictment.

*Reversed and remanded.*

PRYOR, Associate Judge, concurring:

Appellant's conviction at the conclusion of an initial trial was vacated by the presiding judge on the authority of *Monroe v. United States,* D.C.App., 389 A.2d 811 (1978) and *Farrell v. United States,* D.C. App., 391 A.2d 755 (1978). A second trial judge, on the eve of the new trial, dismissed the charges, finding a violation of the Due Process Clause. I concur in the view that this latter order of dismissal was error. My analysis of the case is similar to that expressed by Judge Nebeker but does not reach all the questions addressed in his opinion.

The Supreme Court, in *United States v. Lovasco,* 431 U.S. 783, 790, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977) stated that

[*United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)] makes clear that proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused.

Thus, a court, in considering a due process challenge to a prosecution, must identify actual prejudice to the accused *and* accompanying circumstances which strike at the fundamental fairness of the trial. *Id.*

In this instance the asserted defense was alibi. Notwithstanding the inability of some witnesses to recall a precise date, the record reveals that most were still able to

testify respecting events in support of appellant's alibi. As to this question, the trial judge concluded that since some witnesses "could no longer clearly remember the date in question" that appellant had sustained actual prejudice. Even allowing for the deference to be given to the trial court's ruling, the record shows that the alibi defense is still available to appellant. Thus, there is a serious question, for me at least, as to whether appellant has shown prejudice sufficient to invoke the Due Process Clause.

A more important deficiency of the trial court's order is to be found in the second step of the inquiry: "the reasons for the delay." In addition to the delay caused by the order granting a new trial, the court referred to the nature of the identification evidence and the length of jury deliberation, as factors bearing on its decision. Remembering that this case was not dismissed for lack of a speedy trial, I do not think the court has articulated reasons—putting aside the strength or weakness of the prosecution's case—which can be viewed as an infringement of due process.

In sum, even giving deference to the court's finding of prejudice, I think it was error to dismiss the case in the absence of factors which eroded the fundamental fairness of the trial.

MACK, Associate Judge, dissenting:

I would affirm the trial court's order dismissing the indictment on Fifth Amendment grounds. The murder which is the subject of that indictment occurred on October 27, 1974. Judge Revercomb, in a careful due process analysis, made almost six years thereafter, concluded that appellant could not get a fair trial. I agree.

The trial court correctly noted that the focal point in analyzing a Fifth Amendment due process claim is "whether the delay in bringing the defendant to trial impermissibly denies him the opportunity to have a fair trial. That is to say, to what extent has the defendant been prejudiced by the delay." The court then reasoned that, from

a due process perspective, the three primary ways in which a defendant may be prejudiced by lengthy delays are by 1) oppressive pretrial incarceration; 2) exacerbation of anxiety and concern; and 3) impairment of the development of a full defense to the charges. The court concluded that appellant had been prejudiced under these standards, but it continued its analysis by discussing other concerns which were not "directly implicated." Because I do not read Judge Revercomb's oral opinion as does my brother Nebeker, I am reproducing as an appendix to this dissent the pertinent part of the transcript upon which I rely as providing sound support for affirmance.

Fortunately, only Judge Nebeker suggests that before a defendant in these circumstances can maintain a due process claim, he must demonstrate not only substantial prejudice to his right to a fair trial but also that the delay was an intentional device employed by the government to gain a tactical advantage over him, citing cases dealing with pre-arrest delay or delay preceding indictment. *See United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *Smith v. United States,* D.C. App., 414 A.2d 1189 (1980); *Shreeves v. United States,* D.C.App., 395 A.2d 774 (1978), *cert. denied,* 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979); *Tolliver v. United States,* D.C.App., 378 A.2d 679 (1977). In addition, Judge Nebeker would not take into consideration, in evaluating appellant's due process claims, the entire period of time which has elapsed since the date of the offense, suggesting instead that "absent a showing of substantial or severe prejudice, a pre-arrest delay which satisfies due process cannot be amalgamated to later delays in order to base a Fifth Amendment violation." *Ante* at 57. I find his reasoning troubling.

As a starting point, Judge Nebeker would place the task (well-nigh impossible, and involving a matter only peripherally relevant to the measurement of prejudice) on a defendant of proving deliberate and unfair conduct by the government. Yet, even in the context of due process challenges based solely on pre-indictment or pre-arrest delay, the courts have not uniformly held that unfair conduct must be established; the reason for the delay rather has been considered as a factor which may strengthen or weaken a claim of prejudice. *See, e.g., United States v. Costanza,* 549 F.2d 1126 (8th Cir. 1977) (balancing reasonableness of delay against resulting prejudice to the defendant); *United States v. Sand,* 541 F.2d 1370 (9th Cir. 1976), *cert. denied,* 429 U.S. 1103, 97 S.Ct. 1130, 51 L.Ed.2d 553 (1977) (while applicable statute of limitations provides primary defense to stale criminal charges, indictment may be dismissed on Fifth Amendment due process grounds upon showing that delay was product of deliberate government action *or* that prejudice was so substantial that a fair trial was no longer possible); *United States v. Librach,* 520 F.2d 550 (8th Cir. 1975), *cert. denied,* 429 U.S. 939, 97 S.Ct. 354, 50 L.Ed.2d 308 (1976) (in analyzing Fifth Amendment due process claim arising from pre-indictment delay court must balance reasonableness of the delay against prejudice to the accused); *United States v. Giacalone,* 477 F.2d 1273 (6th Cir. 1973) (absent showing of intentional government delay defendant must demonstrate actual prejudice to sustain due process claim); *Commonwealth v. Rounds,* 490 Pa. 621, 630 n.11, 417 A.2d 597, 601 n.11 (1980) (dicta suggesting that same considerations applicable to speedy trial claims apply to due process violation claim based on delays in proceedings). There is even less reason, in a case such as this, in which appellant's due process claims are far from "speculative and premature," *United States v. Marion, supra* 404 U.S. at 326, 92 S.Ct. at 466, and where prejudice resulted from the lapse of time between the commission of an offense and the date of retrial, to require a defendant to establish unfair conduct on the part of the government.

At the same time, Judge Nebeker would place upon a trial court the well-nigh impossible task of assessing prejudice during specific segments of delay. Theoretically,

he is correct in observing that *United States v. Alston,* D.C.App., 412 A.2d 351 (1980) (en banc) does not govern our evaluation of appellant's due process claims since that case turned on appellate delay. However, the approach to due process claims espoused in the dissent in *Alston* is of equal relevance to an evaluation of the delay which occurred in the instant case:

> I do not see how prejudice to a defendant or a defense can be evaluated without reference to the lapse of time between the [commission of the offense] . . . and the date of the new trial. Simply stated, the problem with the majority's analysis is that its preoccupation with segmented time periods clouds the ultimate question—is the retrial fundamentally unfair because of the cumulative effect of *all* the delays . . . ? . . . In a due process analysis, unlike a speedy trial analysis, the question is not whether there was legitimate reason for the delay, or to whom it is assigned, but whether the overall impact of that delay, coupled with other delays, is to deny the defendant a fair trial after remand. [*Id.* at 363 (Mack, J., dissenting) (emphasis in original).]

We are sending this case back for trial eight years after the commission of an offense, and almost two years after specific findings by a trial judge that appellant could not receive a fair trial. I question the propriety of supplanting the analysis of the trial court, which stands in a better position to judge whether a defendant can receive a fair trial, with a de novo evaluation from the more remote vantage point of an appellate court. *Cf. Reid v. United States,* D.C. App., 402 A.2d 835 (1979) (trial court's post-verdict findings concerning speedy trial claims provide appellate court with most useful perspective and basis for evaluating speedy trial claim on appeal); *Coleman v. United States,* D.C.App., 379 A.2d 710 (1977) (trial court stands in best position to evaluate claim of ineffective assistance of trial counsel). I would afford the trial court's finding in the instant case the type of deference which we have afforded trial court findings in other, similar contexts.

I respectfully dissent.

## APPENDIX

[REVERCOMB, J.]

I am denying the motion to dismiss under the Sixth Amendment and proceeding to the analysis of the denial of a fair trial under the Fifth Amendment, the due process clause of the Constitution.

While under the Sixth Amendment, the right to a speedy trial does not attach until the defendant is arrested or arraigned, *United States v. Marion,* under the Fifth Amendment, the right to a fair trial attaches from the date of the alleged offense. The different triggering date accrues because the focus under the Fifth and Sixth Amendments is different. Under the due process clause of the Fifth Amendment, the focus is whether the delay in bringing the defendant to trial impermissibly denies him the opportunity to have a fair trial. That is to say, to what extent has the defendant been prejudiced by the delay. Under the speedy trial clause of the Sixth Amendment, the focus is whether the delay in bringing the defendant to trial impermissibly denies him a speedy adjudication. That is to say, to what extent has the defendant been unlawfully denied repose. Since the concern under the due process clause is substantial justice and fair play, time having run because of appellate review is also a part of the calculus. *United States v. Alston.* It is irrelevant that the appeal was taken by the defendant.

From a due process perspective, the one indispensable concern during an appeal period is prejudice, since the focus shifts from a speedy to a fair trial. The three primary ways in which a defendant may be prejudiced by lengthy delays are: One, by oppressive pretrial incarceration; two, by exacerbating anxiety and concern of the accused; and three, by impairing the development of a full defense to the charges. Again, *Barker v. Wingo.* Although these factors are suggested under Sixth Amendment analysis, it appears that similar concerns are appropriate under the Fifth Amendment. The Court of Appeals in

*United States v. Alston* prescribed the procedure for determining whether a retrial would violate due process. This process is said in *Alston* to only apply to delay caused by lengthy appellate review. However, since *Alston* is so clearly analogous to the instant situation, its method of due process analysis is followed here.

The first inquiry the trial court must make is whether the defendant has in fact been prejudiced by Governmental delay. The trial court must evaluate the impact of the appeal period on the appellant. It is clear that the defendant has been prejudiced by delay at both the trial and appellate levels. While oppressive pretrial incarceration and exacerbation of anxiety have not been, thus far, accorded Fifth Amendment significance, these concerns implicate due process concerns. In this case, the defendant appears to have been incarcerated for almost two years and ten months, roughly the same amount of time served by two co-defendants who pled to lesser included offenses.

Clearly, the basis of actual prejudice in this matter is that the defendant's incarceration prohibited him from developing a full defense to the indictment. Before the first trial in this matter, the defendant sent a letter to the court, requesting the removal of counsel of record on the grounds that counsel had failed to conduct a reasonable investigation in the case. The court construed the letter as a *pro se* motion, and it was filed as such.

Soon thereafter, on a date that remains unknown, the defendant, defense counsel, and Government counsel appeared before the Court to discuss the *pro se* motion. Although it is likely that the discussion was stenographically recorded, nothing in the records indicates that the transcription was ever found. The court summarily denied two requests for new counsel, one on November 5, 1976, and one on May 10, 1977, and never conducted an inquiry into the basis of defendant's request.

The primary basis for defendant's request for new counsel was, according to defendant's testimony, defense counsel's reluctance to interview alibi witnesses. The Court did not make a requisite inquiry into the basis for the defendant's demand, although the Court did arrange a witness interview schedule with defense counsel and the alibi witness. The Court believes that this action was in violation of *Monroe v. United States* and *Farrell v. United States.* Although these two cases were decided subsequent to the episode, the Court of Appeals has indicated nothing to the contrary in according these decisions full retroactive effect.

Once the witnesses were interviewed by defense counsel, they could no longer clearly remember the date in question; too much time had passed. As a result the defendant's theory of the case was an uncorroborated alibi involving his family. It appears that defense counsel's and the Court's conduct blotted out a substantial defense to the charge, at least one that the defendant attempted to raise. Because the defendant was incarcerated throughout this period, he was unable to assist in finding witnesses for the defense.

Although not directly implicated because of defendant's incarceration, other concerns in this matter must be incorporated into the actual prejudice calculus:

First, this case is basically a one-witness identification case, perhaps a two-witness identification case. In the first trial, only one witness, Robert Smith, specifically testified that the defendant committed the slaying. Mr. Smith, however, at the time of the slaying was a heroin addict and had on that day consumed a half-pint of alcohol. Mr. Smith, a convicted felon, also admitted that his testimony at trial conflicted with that before the grand jury, where he stated that he neither saw the defendant wielding a knife nor stab the victim. Most of the other witnesses to the incident were also drug addicts and convicted felons.

Second, the delay between the alleged slaying and the defendant's arrest is attributable to the Government's choice in prosecuting the wrong individuals. On January 4, 1976 (sic), seven months before Mr. Donaldson was arrested, Harry and David Neal,

now Government witnesses, were tried for murder in this matter. Only after the superseding indictment and arrest of Joseph Donaldson was the conviction of David Neal by a jury overturned by the Court.

Third, while not implicating due process, an important factor in measuring the prejudice to the defendant is the jury's resolution of the case. In the first trial, the jury deliberated an entire day before sending a note to the Court stating that it was hopelessly deadlocked. The Court did not appear to "Winterize" the jury, but it did instruct it to keep trying to reach a verdict. An hour-and-a-half later the jury returned a guilty verdict. Obviously, the jury considered the case as a close one. Given the great amount of time that had passed, no significant alibi defense was made. Even a minimal amount of corroboration may have resulted in an acquittal or a mistrial.

Under *United States v. Alston,* it appears that the total delay in this matter has been prejudicial. The remaining questions for the trial court to decide are whether the relationship between (a) the nature and the severity of the prejudice and (b) the Government's alleged responsibility for the delay warrants dismissal of the indictment. Of course, this is a judgment call in a case of this type. But it appears that the nature of the prejudice, blotting out a substantial defense, and its inherent severity is attributable to the Government and is a result of the summary disposal of the defendant's request for new counsel. In addition, many additional related concerns, the delay prior to arrest, the questionable case at some point against the defendant, although it is represented to the Court now that the case is stronger, the total length of time necessary to bring the defendant to trial causes the Court to believe that all these factors indeed contribute to a due process violation.

I have concluded that the indictment in this matter should be dismissed because a retrial of the defendant would violate his right to due process under the Fifth Amendment.